LAWRENCE L. SZABO, #83974
Attorney at Law
3608 Grand Avenue
Oakland, CA 94610
Tel: (510) 834-4893
*szabo@sbcglobal.net*

Attorney for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

In re                                        )
                                             )    No. 12-40625 RLE
NEIL J. BLOOMFIELD,                          )
                                             )    Chapter 11
            Debtor.                          )
_____  )

# DEBTOR'S FIFTH AMENDED DISCLOSURE STATEMENT

Dated: September 3, 2013

Case: 12-40625    Doc# 309    Filed: 09/03/13    Entered: 09/03/13 15:03:08    Page 1 of 26

# I. INTRODUCTION AND SUMMARY OF THE PLAN

## A. Purpose of This Document

This Disclosure Statement contains information about the Chapter 11 bankruptcy case of Neil Jon Bloomfield (the "Debtor"), filed January 23, 2012, and describes the Debtor's Plan of Reorganization (the "Plan") filed by the Debtor.

***Your rights as a Creditor may be affected by the Plan. You should read the Plan and this Disclosure Statement carefully and discuss them with an attorney.***

The proposed distributions under the Plan are discussed in Section III, commencing at page 11 of this Disclosure Statement. The Plan places claims against the Debtor bankruptcy estate and the equity interests of the Debtor in the bankruptcy estate in various classes and describes the treatment that each class will receive. The Plan also states whether a class of claims is "impaired" under the Plan, i.e., whether the Plan alters the legal, equitable and contractual rights of a class of claims. Generally, only impaired classes of claims are entitled to accept or reject the Plan (i.e., "vote" for or against the Plan). ***If the Court confirms the Plan, the recovery on your claim will be limited to the amount provided by the Plan.***

**Non-priority, unsecured claims,** including the unsecured portion of claims that are secured by property of the estate, are classified as Class 3 claims, and are estimated by the Debtor to total $3,294,846. Class 3 claims will receive a distribution of the net amount Debtor may collect from his portion of a judgment, after payment of administrative expenses, and a distribution of $15,000, payable at $250 per month for 60 months, commencing after final payment of priority unsecured claims, which is January 23rd, 2017. Debtor estimates that the $15,000 distribution would pay approximately 0.4% of the allowed unsecured claims. If the Trieber judgment is collected, Debtor estimates that the Plan may be able to distribute, after payment of administrative expenses, an additional $10,000 to $150,000 to allowed non-priority unsecured claims which would increase the distribution to approximately 0.7% to 5.0% of allowed, non-priority unsecured claims.

## B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court will hold a hearing to determine whether the Plan meets all of the requirements for confirmation. The date and time of the hearing is: October 22, 2013 at 1:30 p.m.

If you are entitled to vote to accept or reject the plan, please indicate your acceptance or rejection on the enclosed ballot and return the ballot in the enclosed envelope to counsel for the Debtor, Lawrence L. Szabo, 3608 Grand Ave., Oakland, CA 94610.

Your ballot must be received by October 7, 2013. Untimely-received ballots will not be included in the tally of ballots.

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon Debtor's counsel by October 7, 2013.

Case: 12-40625    Doc# 309    Filed: 09/03/13    Entered: 09/03/13 15:03:08    Page 2 of 26

If you want additional information about the Plan, you should contact Lawrence L. Szabo, 3608 Grand Ave., Oakland, CA 94610, 510-834-4893, *szabo@sbcglobal.net*.

### C. Representations in the Disclosure Statement

Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without error, although Debtor has made reasonable efforts to insure that the information contained herein is accurate, complete and free from error. Except as otherwise noted, all estimates and analysis with respect to Debtor's assets, claims against Debtor, property values, and pending or anticipated litigation, are Debtor's best estimates. Debtor cannot warrant that actual values, results, and recoveries will be consistent with this Disclosure Statement.

*The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation. The Court's approval of this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan.*

## II.  BACKGROUND

### A.  Description and History of the Debtor's Business Activities

Debtor**,** Neil Jon Bloomfield, is a 68-year-old unmarried man who practices law and invests in real estate. The Debtor started his legal career in New York after graduating *cum laude* from Harvard Law School in 1969.  The Debtor became a member of the California bar in 1972.  Debtor also invests in real estate and occasionally provides services as a licensed real estate broker.

Debtor began doing business in 1974 under the name "The Law Offices of Neil Jon Bloomfield" ("LONJB"). LONJB is not a partnership, corporation or limited liability company and thus is not an "insider" of the Debtor as that term is defined by the Bankruptcy Code, §101 (31). LONJB is a "dba" of the Debtor.  As Debtor's practice expanded, Debtor borrowed money to fund LONJB's increased overhead, including a $200,000 line of credit in June 2002 from Westamerica Bank secured by LONJB's accounts, chattel paper and general intangibles. Debtor, starting around 2010, began to wind down LONJB, and focused his efforts on his newly incorporated law practice, Bloomfield Law Group, Inc.  ("BLG").

Debtor also borrowed money to invest in highly leveraged real estate.  In 2007, Debtor invested in Texas real estate with the intention of developing equine-related properties. The Debtor acquired 9635 Cole Road, Pilot Point, Texas, a 10-acre horse ranch in an unincorporated portion of Denton County, Texas, which consists of a single family residence, 2 stables, a mobile home, a covered arena, a shaving barn with attached workers quarters, and a shop with 2 attached studio apartments.

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 3 of 26

Debtor and another individual formed Cole Road Enterprises, LLC ("CRE"), and in January 2011 CRE lease-optioned 9681 Cole Road, Pilot Point, Texas, a 9.77-acre ranch property adjacent to 9635 Cole Road. CRE started a vacation rental and equine boarding business on property. The Debtor learned that the property had a history of underground pipe failures and other problems after a 100-year freeze broke underground and aboveground water pipes. Litigation expenses, a severe drought in 2010-2011, poor economic conditions, and the lack of a proper serviceable underground water supply led to the shutdown of the vacation rental business. CRE was unable to make the lease payments, and the seller/landlord brought eviction and damages actions against the Debtor and CRE in January 2012. CRE and the Debtor counter-sued. The seller/landlord obtained a judgment for possession on January 20, 2102. CRE and Debtor both filed for Chapter 11 relief on January 23, 2112. The CRE Chapter 11 case was dismissed on June 20, 2012.

In January 2012, Debtor faced the foreclosure of his interest in 9635 Cole Road and the foreclosure of his interest in a single-family rental property located at 29 Anton Way in Novato, California. Debtor was also in substantial default in the payments due on his $259,881.24 secured debt to Westamerica Bank.

**B. Insiders of the Debtor**

 **1. Bloomfield Law Group, Inc. ("BLG").** Debtor is the president and sole shareholder of a professional law corporation named Bloomfield Law Group, Inc. ("BLG"). BLG registered with the State Bar of California on February 10, 2010 and began its operations on March 1, 2010. BLG is a full-service law firm that primarily engages in civil litigation, debt relief, family law, and real estate law. Debtor's income for providing legal services is now received from BLG, except to the extent that Debtor receives occasional payments on accounts generated from when he did business as LONJB. Before April 16, 2013, BLG paid shareholder distributions to Debtor, not a regular salary. Commencing April 16, 2013, BLG began to pay Debtor a salary of $2,200 gross per month, which after taxes and other withholding nets Debtor $1,814.18 per month.

 **2. Point Vision Ranch, LLC.** Debtor owns a 100% membership interest in Point Vision Ranch, LLC ("PVR"). Debtor created PVR to manage the Debtor's ranch properties in Texas. PVR occasionally pays some ranch expenses but it has no hard assets and no net value. It never generated significant revenues. At various times its bank account held as much as $2,000; presently its bank deposit account balance is about $16.46. PVR was never profitable, and never owned any tangible property.

 **3. Dillon Vision, LLC.** Debtor owns a 50% membership interest in Dillon Vision, LLC ("DV"). DV purchased three parcels of land in Marin County, California, and successfully operated, divided, and sold them. Its last real estate venture was 17990 State Route 1 in Marshall, California, which was sold in October 2010. Its present assets are about $2,000 in bank deposits and a tractor. During 2006, DV sold the ranch located at 2999 Dillon Beach Road, Marin County, California, where the tractor is now stored, outdoors. The tractor may be worth $5,000. DV owes at least $2,000 for legal fees and tax preparation fees and it

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 4 of 26

may owe storage fees for the tractor. The tractor has not been used for at least 5 years. DV will probably sell the tractor in the next year or two unless it undertakes another land project in West Marin that needs a tractor.

**4. Cole Road Enterprises LLC.** Debtor owns a 50% interest in a Texas limited liability company, Cole Road Enterprises, LLC ("CRE"), formed in January 2011. CRE lease-optioned a ten-acre ranch located at 9681 Cole Road, Pilot Point, Texas, and started a vacation rental and equine boarding business on the property. As discussed further below, insurmountable problems with the 9681 Cole Road property resulted in the cessation of all business activities and the termination of the lease for the property. CRE no longer has any operations or income, and it has no assets.

### C. Events Leading to Chapter 11 Filing

Before 2007, Debtor was generally able to develop and sell his real estate investments for a profit. However, due to the general sharp decline of real estate values since 2007, Debtor could not sell his real estate investments for a profit or refinance them. Many of the properties Debtor had invested in had significant negative cash flows.

The decline in the real estate market also affected Debtor's law practice because most of Debtor's major clients had also invested in real estate. Debtor's LONJB practice was unable to pay the debt owed Westamerica Bank and its increased overhead. Debtor therefore, around 2010, began to wind down his LONJB practice and focused his efforts on his newly incorporated law practice, BLG.

In 2007, Debtor invested in Texas real estate with the intention of developing equine-related properties. The Debtor acquired 9635 Cole Road, Pilot Point, Texas, a 10-acre horse ranch in an unincorporated portion of Denton County, Texas, which consists of a single family residence, 2 stables, a mobile home, a covered arena, a shaving barn with attached workers quarters, and a shop with 2 attached studio apartments.

Debtor and another individual formed Cole Road Enterprises, LLC ("CRE"), and in January 2011 CRE lease-optioned 9681 Cole Road, Pilot Point, Texas, a 9.77-acre ranch property adjacent to 9635 Cole Road. CRE started a vacation rental and equine boarding business on property. The Debtor learned that the property had history of underground pipe failures and other problems after a 100-year freeze broke underground and above ground water pipes. Litigation expenses, a severe drought in 2010-2011, poor economic conditions, and the lack of a proper serviceable underground water supply led to the shutdown of the vacation rental business. CRE was unable to make the lease payments, and the seller/landlord brought eviction and damages actions against the Debtor and CRE in January 2012. CRE and the Debtor counter-sued. The seller/landlord obtained a judgment for possession on January 20, 2102. CRE and Debtor both filed for Chapter 11 relief on January 23, 2112. The CRE Chapter 11 case was dismissed June 20, 2012.

In January 2012, Debtor also faced the foreclosure of his interest in 9635 Cole Road and his single-family rental property located at 29 Anton Way in Novato, California. Debtor

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 5 of 26

was also substantially in default on his $259,881.24 debt to Westamerica Bank, which is secured by the accounts, chattel paper and general intangibles of the Debtor, dba LONJB.

### D. Significant Events During the Bankruptcy Case

Commencing April 16, 2103 Debtor began to receive a regular salary from BLG of $2,200 per month. Debtor believes that BLG will be able to provide him more income in the future because BLG is reviewing its credit policies to minimize over time its historically large percentage of bad debt write-offs for account receivables. Debtor has minimized his living expenses, and has eliminated the expense of the 2006 Sundowner 720 HGN Slant Load horse trailer by returning the trailer to the secured lender in September of 2012. Debtor paid off the loan on the 2000 Fleetwood Jamboree motor home in July of 2012. Debtor also eliminated the expenses of a 1988 Ford Econoline 350 minibus and a 1990 Ford F-250 pickup by abandoning the bankruptcy estate's interest in the vehicles. The Debtor surrendered the 2009 Ford F-450 pickup to Ford Motor Credit on August 2, 2013, thereby eliminating a $1,090 monthly expense.

The 9681 Cole Road litigation was settled in April 2012. Under the terms of the settlement, approved by the Bankruptcy Court, the Debtor and CRE surrendered possession of 9681 Cole Road to the seller/landlord and gave up all claims for ownership of 9681 Cole Road. The settlement also provided for the dismissal of all litigation between the parties, and the complete release of each party from any liabilities to the other parties. See "Debtor's Motion for Approval of Settlement of Controversy," Docket no. 60, filed April 12, 2012, and the "Order on Debtor's Motion to Approve Compromise," Docket no.70, filed May 3, 2012.

Debtor has some experience representing clients in bankruptcy matters, and the Debtor therefore hoped to minimize the administrative expenses of his bankruptcy estate by representing himself in the case. However, at the Court's suggestion, Debtor decided to retain the services of experienced bankruptcy counsel in order to help formulate a disclosure statement and plan. Debtor therefore requested that the court approve the employment of Lawrence L. Szabo and payment of a $10,000 retainer from estate funds. The court approved by the retainer and the employment of Lawrence L. Szabo, effective January 9, 2013. See "Order Approving Employment and Use of Estate Funds to Employ Attorney," Docket no. 252, entered March 25, 2013.

No adversary proceedings have been filed by or against Debtor in the Bankruptcy Court, and the Debtor has not to date contested the allowance of any claims. The only legal or administrative proceeding pending against Debtor is *Howie v. Bloomfield*, Marin County Superior Court, No. CIV 12-05148, filed November 16, 2012, which is after Debtor filed his Chapter 11 case in January 2012. It is likely that Howie's action is a nullity because it was filed in violation of the automatic stay imposed by the filing of Debtor's case. See: *In re Schwartz*, 954 F.2d 569 (C.A.9 (Wash.) 1992) (acts in violation of the automatic stay are void, rather than voidable). Debtor advised Howie and the Superior Court that he filed a chapter 11 case, and Howie has not since actively pursued the Superior Court action.

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 6 of 26

The plaintiff in *Howie v. Bloomfield,* Robert "Skip" Howie, is a successful trial lawyer who has practiced law for over 30 years. Howie owns about 77% of and is the manager and bankruptcy responsible person for Scotland-Colorado, LLC, which owns interests in multiple real properties, including Mr. Howie's personal residence. Mr. Howie's residence faced foreclosure late in 2010. Scotland–Colorado therefore employed BLG to file for relief under Chapter 11. Its petition was filed on January 21, 2011 in the U.S. Bankruptcy Court for the Northern District of California*, San Francisco Division, In re Scotland–Colorado LLC,* Case no. 11-30246 TEC, and the bankruptcy court approved Scotland-Colorado's employment of BLG as its legal counsel.

Scotland–Colorado could not obtain confirmation of a plan to 'save' the Howies' residence because the Howies did not have sufficient income to make the contractual payments and cure the large arrearage on their home mortgage, and because Scotland–Colorado did not permit BLG to file a plan to abandon the Howie's residence back to the Howies and permit relief from stay. Nevertheless, the Howies blamed Debtor for the "loss" of their severely "underwater" residence. Howie's complaint against Debtor, filed November 2012, sets forth causes of action for legal malpractice, fraud, breach of fiduciary duty, breach of contract, and "Elder Abuse Welfare and Institutions Code § 15610 *et seq.*"

BLG filed its final fee application in the Scotland–Colorado case in December 2012. Scotland–Colorado objected to any award of fees to BLG, contending that BLG should be denied all fees because BLG committed malpractice by giving the Howies bad advice as to how to "save" their residence.

In February 2013, the Bankruptcy Court ruled on Scotland–Colorado's objection to BLG's request for fees and found the Howies' arguments in support of their malpractice claim "unpersuasive." The court stated, "[i]t is difficult to see how the Residence could ever have been saved . . . . Neither [Scotland–Colorado] nor the Howies had sufficient income to make regular debt-service payments going forward, let alone cure the large arrearage." "Memorandum Decision re Objection to Final Fee Application of Debtor's Counsel," *In re Scotland–Colorado LLC,* Case no. 11-30246 TEC, Docket no. 288, p. 3, l. 5-10. The Court "therefore decline[d] to deny or reduce fees on the basis that Bloomfield breached any duty of care to his client." "Memorandum Decision," p. 12, ll. 10-12.

The Court, being fully aware that Mr. Howie had filed his action against Debtor, also stated:

> Because Bloomfield, as counsel for debtor in possession, is an officer of this court, he cannot be sued for malpractice arising out of his representation of Debtor without permission of this court [citation omitted]. Because this court has rejected the claims of malpractice asserted on behalf of Debtor in determining Bloomfield's fees, any such claim of Debtor is very likely barred under principles of issue preclusion [citation omitted].

"Memorandum Decision," p.10, ll. 6-14.

Howie, despite having filed his action against Debtor in violation of the stay, and despite the Bankruptcy Court pointing out to Howie that its findings very likely bar him from raising the issue of legal malpractice in another action, has not dismissed the action. Howie has not filed a filed proof of his claim in Debtor's case. Debtor did not include Howie in his original schedules of creditors filed with the Court because he was not aware of Howie's claim until Howie filed the action against him, which was well after Debtor filed his chapter 11 case.

Debtor reported the filing of the action to BLG's professional negligence insurance carrier which hired counsel to represent Debtor. BLG's insurer will likely indemnify Debtor if Debtor is found to have liability for professional negligence. To the extent that Debtor may have liability that is not indemnified, Howie's claim is subject to a discharge entered in Debtor's case.

**E. Avoidable Transfers**

Bankruptcy law allows a bankruptcy estate to avoid certain transfers of a debtor's property that occurred before the filing of the bankruptcy case. For example, the bankruptcy estate may avoid and recover for the benefit of the estate certain payments to creditors made within 90 days before filing (within one year, if the creditor is an "insider"). To the best of Debtor's knowledge, Debtor made no avoidable preferential payments to a creditor. Bankruptcy law also allows a bankruptcy estate to avoid transfers made by the Debtor with the intent to hinder, delay or defraud creditors, or transfers for which the Debtor received a less than a reasonably equivalent value. To the best of Debtor's knowledge, Debtor made no such transfers. Debtor therefore does not intend to pursue preference, fraudulent conveyance, or other avoidance actions. The Debtor's Plan reserves the right to pursue preference or avoidance actions should the Debtor discover grounds for such actions.

**F. Claims Objections**

The Debtor's Plan reserves the right to object to claims, except to the extent that a claim is allowed pursuant to a final, non-appealable order. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article VII of the Plan.

Debtor presently intends to object to the claim of the Marin County Tax Collector secured by 233 Hillside, Fairfax, CA (Claim 2-F), because it was paid. Debtor presently intends to object to the secured claim of the Denton County Tax Collector secured by 9635 Cole Road, Pilot Point, TX (Claim 2-J), because it was paid. Debtor presently intends to object to the claim of the Denton County Tax Collector secured by 9681 Cole Road, Pilot Point, TX (Claim 2-J-1) because it has been fully paid and because Debtor had only a recorded optionor's interest and surrendered that interest to the title holder/optionor. Debtor also intends to object to the claim of Redwood Credit Union secured by the Debtor's 2006

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 8 of 26

Sundowner (Claim 2-L), because the property was surrendered to the secured lender in satisfaction of the secured debt. Debtor intends to object to the claim of Redwood Credit Union secured by the Debtor's 2000 Fleetwood Jamboree (Claim 2-M), because that claim has been paid in full by the adequate protection payments which Debtor has made to the holder of the claim since the filing of the case. <u>The Plan provides that Debtor will object to these claims within 30 day after confirmation of the Plan, if they are not withdrawn by the effective date of the Plan</u>.

### G. Assets of the Estate.

The identity, the fair market value, and the source of the valuation of the estate's present assets are set forth in the attached Exhibit A liquidation analysis.

**1. Real Property Interests**. The Debtor's fee simple, improved real estate interests (233 Hillside Drive, 29 Anton Way, and 9635 Cole Road) were professionally appraised. As indicated in the Debtor's monthly operating reports, Debtor has continuously received rental income from 233 Hillside and from 29 Anton Way since the case was filed. Cash flow from the Debtor's property at 9635 Cole Road has been sporadic.

Debtor, who is also a licensed real estate broker, believes that his valuations of his unimproved properties at 11793 Widgeon Way, Clear Lake, CA and 9908 Main Street, Monte Rio are reasonable, given the location and condition of the properties. Debtor believes the Widgeon Way property, an unstable, steeply sloping lot, is worth only $1,000 because it may slide and create liability to owners of adjacent parcels.

Debtor has not obtained a professional valuation of his remainder interest in 1878 Virginia Street, Novato, CA. According to information published "on-line," the property is a 3 bedroom, 2 bath, 1,645 sq. ft. home built in 1977. The Debtor's interest in 1878 Virginia Street, Novato, CA is a remainder interest, subject to the life estate of Catherine Fredricksen. Debtor's remainder interest does not vest until the death of the life tenant. Debtor believes that Catherine Fredricksen's is 62.8 years old. Debtor knows little about the status of the life tenant because he obtained his interest by a foreclosure sale. He has not personally inspected the property and can make no representation regarding its condition, other than it appears to be well-maintained.

Debtor believes that a fee interest in 1878 Virginia Street is worth about $500,000 and estimates the market value in a partition sale of his remainder interest at $245,000 or more, based upon an actuarial table and the life tenant's age of 62.8 years. The Debtor's remainder interest is secured by deeds of trust that secure debts totaling at least $211,000. While Debtor believes that there is legal authority under California law that would allow a court, at the request of the holder of the life estate, to force the sale of the entire fee interest of the property and to divide the proceeds between the remainder interest and the life estate, Debtor believes that it would be very costly to bring such litigation and that it could be difficult to convince a court to displace the life tenant by such a sale. It might also be very difficult to sell the Debtor's remainder interest without a court-ordered partition. The Plan therefore treats the allowed secured claims of creditors who hold first, second and third deeds of trust against

Case: 12-40625    Doc# 309    Filed: 09/03/13    Entered: 09/03/13 15:03:08    Page 9 of 26

Debtor's remainder interest by "surrendering" the Debtor's remainder interest to the holder of the claims.

**2. The Trieber Judgmen**t.  The Chapter 11 estate owns 40.25% of a judgment for fraud against an individual, Richard Trieber ("Trieber Judgment").  The Marin County Superior Court entered judgment in February 2008 for $526,824.70 in the case *Treadway, et al v. Trieber, et al,* No. CV 072748, plus interest at the California statutory rate (10%).  Debtor has calculated the face value of the estate's interest in the Trieber Judgment to more than $212,000.

Trieber filed a Chapter 7 bankruptcy case in the fall of 2011. Trieber received a discharge of most of his other debts; however, the Debtor and the two other owners of the Judgment filed a complaint to except the Judgment from Trieber's discharge.  The bankruptcy court entered a judgment excepting the Judgment from Trieber's discharge, and that judgment is final.

BLG has worked diligently on behalf of the Debtor and the two other owners of the Trieber Judgment to collect the Judgment.  The Debtor and Trieber have discussed a possible settlement whereby Trieber would pay a percentage of the Trieber Judgment amount in installments in return for the promise by the three judgment creditors to not execute on the judgment if Trieber makes the agreed payments.  These discussions may or may not bear fruit and Trieber may or may not make the payments.  Debtor reasonably believes that an installment settlement is possible, and that the settlement will, over time, bring funds into the estate.  Debtor believes, on the basis of his knowledge of Trieber's financial situation and his discussions with Trieber, that it is not unreasonable to expect that the settlement would net the estate, after payment of costs of collection, between $50,000 and $150,000, paid over a two to three-year period. Debtor believes, based upon his experiences with Trieber, that Trieber is able to pose enormous barriers to non-consensual collection activities. However, Debtor is informed and believes that Trieber has been able to raise large amounts of money to fund his activities from time to time. Debtor therefore believes that there is some likelihood that Trieber would pay an agreed amount at an agreed installment rate over time. A discounted, below face value settlement of the estate's interest in the Trieber Judgment for less than full face value would require approval of the Court.  The Debtor believes that Debtor will be in a position to request such approval of a settlement of the claim some time later in 2013 or early in 2014.

**H. The Liquidation Value of the Debtor's Estate**:

If any creditor or equity interest holder does not accept the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive in chapter 7 liquidation. In a Chapter 7 liquidation, a court-appointed trustee liquidates all nonexempt assets of the debtor and distributes the proceeds to administrative expenses and creditors. A liquidation analysis is therefore attached to this Disclosure Statement as Exhibit A. As indicated in Exhibit A, most of Debtor's assets are either fully encumbered, or are exempt from creditor's claims.

In a Chapter 7 liquidation of the estate, the direct costs of liquidating property of the estate, such as broker fees, would be paid first. After payment of any liens against the property, the expenses of administration of the Chapter 7 case (attorneys fees, trustee's fees and post-petition taxes) and expenses for the administration of the superseded Chapter 11 case (attorney's fees, United States Trustee's fees and post-petition taxes) are paid, followed by pre-conversion claims for expenses necessary to preserve the estate.

A chapter 7 trustee of the Debtor's hypothetical Chapter 7 bankruptcy estate would most likely abandon all of the improved and unimproved real property assets of the Debtor because there would be no net to the estate after payment of existing liens and encumbrances and the costs of sale, and the expenses of administration.

A chapter 7 trustee would also likely abandon the Trieber judgment, or, sell it for a very nominal amount, for the following reasons:  it is 1/3 of a judgment, not easy to separate from the other two-thirds.  Neil Bloomfield has over a decade of experience litigating with Mr. Trieber, which enables him, through BLG, to be more effective than an attorney new to the situation; furthermore, the collection efforts would very likely have very large attorney's fees, where at present BLG is not charging the estate for its fees. This would change in a Chapter 7. Mr. Trieber operates a non-profit Mexican corporation which pays him only occasionally.  It is difficult to collect from the non-profit Mexican corporation because it is not the judgment debtor and it has no presence in the United States. Trieber filed a Chapter 7 and the trustee in his Chapter 7 found nothing worth pursuing with regard to Mr. Trieber's scheduled assets, including the nonprofit corporation. Mr. Trieber is apparently fearful of BLG as a litigator because of BLG's long collection history against him, and this factor makes the asset more valuable to the Chapter 11 estate than it would be to a liquidating trustee.  The Trieber judgment, in the view of the Debtor, is more valuable to the present Chapter 11 estate than it would be to others. The liquidation analysis attached hereto as Exhibit A therefore assigns a liquidation value of $5,000 to the Debtor's 1/3 interest in the Trieber judgment.

The BLG practice is a subchapter S corporation formed in 2009 and first licensed in 2010. All expenses and debts of BLG and of the liquidation of BLG and all claims against BLG would be paid prior to any distribution to holders of claims against the Debtor.  Debtor's schedules valued his equity interest in BLG at $9,000, and the Debtor claimed $9,000 of that value exempt.  After filing his schedules, Debtor carefully examined BLG's liabilities and accounts receivables and determined that as of April 1, 2013, the liabilities of BLG total $111,094 and that the liquidation value of BLG receivables is $84,640. Debtor therefore concludes that the liquidation value of the estate's interest in BLG is "zero."

## I. The Debtor's Current and Historical Financial Condition.

The Debtor's recent post-petition monthly operating report, for July 2013, is attached hereto as Exhibit B. An income and expense statement for the operations of BLG through April of 2013 is attached hereto as Exhibit C.

A projection of income and expenses for the operation of Debtor's rental properties, and Debtor's total projected disposable income, is attached hereto as Exhibit D.  Exhibit D indicates that Debtor's projected monthly disposable income is $295, an amount sufficient to

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 11 of 26

fund the Plan's payments to priority and non-priority unsecured creditors (estimated to be $254 per month, followed by $250 per month, respectively).

## III. SUMMARY OF THE PLAN OF REORGANIZATION

### A. Unclassified Claims: Administrative Expenses and Priority Tax Claims

Certain types of claims, including the expenses of administering the estate and priority tax claims, are automatically entitled to specific treatment under the Code. The Code therefore does not require classification of such claims. Unclassified claims are deemed unimpaired and are not entitled to accept or reject the Plan; however, they may object to confirmation of the Plan if their treatment under the Plan does not comply with the Code's requirements.

**1. Administrative Expenses of the Debtor's case.** Administrative expenses are the costs or expenses of administering Debtor's chapter 11 case as allowed under § 503 (b) of the Code. The Code requires Debtor to pay all allowed administrative expenses in cash on the effective date of the Plan, unless a particular claimant agrees to a different treatment. Administrative expenses of the Debtor's case include:

**a. Post-petition Expenses Arising in the Ordinary Course of Business and Financial Affairs of the Debtor.** The Debtor incurs regular expenses in preserving property of the estate, e.g., the expense of maintaining his old client files, and his personal living expenses. Such expenses are to be paid in full on the Effective Date of the Plan, or according to the terms of the obligation, if later, or as otherwise agreed.

**b. Professional Fees**. The fees and expenses incurred by the attorney for the Debtor, Lawrence L. Szabo (LLS), are allowable an administrative claim. Debtor has not retained any other professional. The fees and expenses of LLS total approximately $40,000 as of June 18, 2013. If the case proceeds to confirmation, Debtor estimates that LLS will incur additional fees and expense of at least $5,000. Any payment of the professional fees and expenses of LLS must be approved by the Bankruptcy Court after notice and a hearing. LLS has yet to file a request for allowance of his fees and expenses. It is unlikely that the estate will have funds available on the effective date of the Plan to pay the administrative expense of LLS in full. LLS was paid a $10,000 retainer that LLS holds in his client trust account. The Plan provides that the retainer will be applied to the fees and costs allowed by the bankruptcy court to LLS. The Plan provides that, after payment of the $10,000 retainer, the balance of the administrative claim allowed LLS will be paid from the proceeds of the Trieber Judgment, before any distribution of the proceeds to the holders of Class 3 allowed claims, or on other terms as agreed between Debtor and LLS.

**c. Office of the U.S. Trustee Fees.** Such fees are to be paid in full on the effective date of the Plan. As of June 18, 2013, Debtor believes that he has paid all such fees that have become due.

Case: 12-40625    Doc# 309    Filed: 09/03/13    Entered: 09/03/13 15:03:08    Page 12 of 26

### 2. Priority Tax Claims

Priority tax claims consist of income, employment, and other taxes as described by § 507(a)(8) of the Code. The United States Department of the Treasury, Internal Revenue Service (IRS) has timely filed a $9,271.24 priority tax claim. The State of California, Employment Development Department (EDD) has timely filed a $626.28 priority tax claim.

Unless the holder of a § 507(a)(8) priority tax claim agrees otherwise, the Code requires that such claims be paid in full with interest in regular installments over a period not exceeding 5 years from the filing of the Chapter 11 case, which is January 23, 2017. The plan provides that the Debtor will pay the IRS and EDD claims, plus interest at the rate of 3% per annum, in equal monthly installments that begin on the 23rd day of the first full month following the date of confirmation and end on January 23, 2017. If the payments would commence September 23, 2013, the Plan would require the Debtor to pay 40 monthly installments to the IRS and EED of $ 239.30 and $16.16, respectively. If payments commence at a later time, the monthly installments due the IRS and FTB priority tax claims correspondingly increase.

### B. Classification and Treatment of Claims and Equity Interests

**1. Non-tax, Priority Unsecured Claims (Class 1).** The Code grants unsecured claims of the type referred to in §§ 507(a)(1), (4) (5), (6) and (7) of the Code a priority for payment. A plan must therefore pay such claims in full upon the effective date of the Plan. Such claims maybe generally described as domestic support claims, wages and employee benefit claims, claims against grain or fish storage facilities, and customer deposit claims. Article II of the Plan classifies such claims as Class 1 claims. To the best of Debtor's knowledge, no creditor holds such claims against the Debtor.

**2. Claims Secured by Property of the Estate (Classes 2-A through 2-R).** Allowed secured claims of creditors are classified in Article II of the Plan. The Plan's treatment of the classes of allowed secured claims is set forth under Article IV of the Plan. *The Plan, not this Disclosure Statement, determines the classification and treatment of all allowed claims. Secured creditors should therefore read the Plan in order to determine how their claim(s) are classified and treated.*

Section 506 of the Bankruptcy Code may bifurcate the claim of a creditor that is secured by property of the bankruptcy estate into two claims: a secured claim, and an unsecured claim. A creditor's secured claim is allowable in an amount equal to the value of the property securing the creditor's claim. The portion of a creditor's claim that exceeds the value of the property securing the claim is allowable as an unsecured claim.

Certain claims against the Debtor that are secured by property of the bankruptcy estate are bifurcated by operation of § 506. Debtor filed motions requesting that the Court value his interests in 233 Hillside, 29 Anton Way, and 9635 Cole Road. The valuation motion for 233 Hillside resulted in a stipulation between the Debtor and of Bank of America, N.A. that the claim that is secured by a first priority deed of trust for 233 Hillside shall be allowed as a $1,013,115.00 secured claim and a $866,194.80 unsecured claim. *See: "*Stipulated Order

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 13 of 26

Valuing Claim Secured by First Lien on Real Property Known as 233 Hillside Drive, *etc.,"* Docket no. 271, entered May 28, 2013.

The valuation motion for 233 Hillside also resulted in the determination by the court that the $265,710.72 claim of Bank of America, N.A., secured by a <u>second</u> priority deed of trust for 233 Hillside, shall be allowed only as an unsecured claim. *See: "*Order Granting Amended Motion Setting Property Value of 233 Hillside Drive, *etc.,"* Docket no. 136, entered July 16, 2012.

The valuation motion for 29 Anton Way resulted in the Bankruptcy Court's determination that the Anton Way property has a value of $730,000. The $1,877,860.01 claim of the Bank of New York Mellon, secured by a first priority deed of trust for 29 Anton Way, is therefore allowed as a $730,000 secured claim and a $1,147,860.00 unsecured claim. The Bankruptcy Court also determined that the Bank of New York Mellon's $7,485 claim, secured by a second priority deed of trust for 29 Anton Way, shall be allowed only as an unsecured claim. *See:* "Order on Debtor's Motion to Determine Value of Claim Secured by First Deed of Trust Lien on Real Property at 29 Anton Way, Novato California," Docket no. 210, entered December 18, 2012; *See also*: "Order on Debtors Motion to Determine Value of Claim Secured by Second Deed of Trust Lien on Real Property at 29 Anton Way Novato, California," Docket no. 137, entered July 16, 2012.

The valuation motion for the 9635 Cole Road resulted in the determination by the Bankruptcy Court that Wells Fargo Bank's $174,822.31 claim, secured by a second priority deed of trust for 9635 Cole Road, is allowed only as an unsecured claim. *See:* "Order Granting Motion Setting Property Value of 9635 Cole Road, *etc.*," Docket no. 138, entered July 16, 2012.

*Creditors who hold unsecured claims as the result of the bifurcation of their claims by section 506 should also read Article VI of the Plan, which classifies and treats all non-priority unsecured claims as Class 3 claims.*

The following describes claims that are secured by property of the estate and discusses their classification and treatment by the Plan:

**Bank of America, N.A., 233 Hillside Drive:**

**Class 2-A consists of** the allowed claim presently held by **Bank of America, N.A.,** to the extent it is allowed as a claim secured by a first priority deed of trust interest in **233 Hillside Drive, Fairfax, California.** The Plan treats the Class 2-A allowed secured claim as set forth in a certain "Loan Modification Agreement." The Agreement requires Debtor to pay $1,013,115.00, plus interest at 2%, in monthly installments of $3,067.97 commencing July 1, 2013, for 60 months. Commencing July 1, 2018, interest increases to 3%, and Debtor pays principal and interest in monthly installments of $3,558.34 for 12 months. Commencing July 1, 2019, interest increases to 3.59%, and Debtor pays principal and interest in monthly installments of $3,852.79 for 408 months. The Agreement also obligates Debtor to pay a monthly escrow payment for taxes and insurance, estimated to be $1,586.38. Such escrow

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 14 of 26

payments will be adjusted periodically. Marin County has recently lowered the tax assessment and tax payments, so the escrow payments may decrease, and may or may not later increase over the term of the Agreement. To the extent that Class 2-A's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

**The Bank of New York Mellon, 29 Anton Way**:

**Class 2-B** consists of the allowed claim presently held by **The Bank of New York Mellon**, to the extent it is allowed as a claim secured by a first priority deed of trust interest in **29 Anton Way, Novato, California.** The Debtor and the holder of the allowed claim have stipulated to certain treatment of the Class 2-B allowed claim. See "Stipulation for Plan of Reorganization's Treatment of Claim of Secured Creditor, The Bank of New York Mellon," Docket no. 289. Pursuant to the stipulation, the Plan treats the Class 2-B allowed secured claim by requiring the Debtor to pay $730,000, plus interest at the rate of 5.00%, payable in 480 monthly installments of $3,520.00 commencing on the first day of the first full month following the effective date of the Plan and continuing on the first day of each month thereafter. To the extent that Class 2-B's claim is allowed an unsecured claim, its claim is treated as a Class 3 claim.

**HSBC Bank USA, N. A**., **9635 Cole Road**:

**Class 2-C** consists of the allowed claim presently held by **HSBC Bank USA, N. A**., to the extent it is allowed as a claim secured by a first priority deed of trust interest in **9635 Cole Road, Pilot Point, Texas.** The holder of the claim has elected under § 1111(b) of the Code to be treated as a secured claim to the extent that its claim is allowed. The Plan treats the allowed Class 2-C claim by requiring the Debtor to pay $1,154,769.68, the allowed amount of the Class 2-C claim, in 60 installments of $2,600 commencing on the first day of the first full month following the effective date of the Plan, and continuing monthly thereafter, followed by 60 installments of $4,800, commencing on the first day of the 61st month following the effective date of the Plan, followed by the sale or refinance of the property securing the claim and the $710,769.60 payment from the sale or refinance proceeds on the first day of the 121st month following the effective date of the Plan. Because of its §1111(b) election, the holder of the claim does not have an unsecured claim and is not entitled to accept or reject the Plan as the holder of a Class 3 claim.. However, the Debtor and the holder of the Class 2-C claim are also negotiating a possible loan modification or other loss mitigation alternative with the Debtor. If and only if such a loan modification or other loss mitigation alternative is mutually agreed upon by the Debtor and the holder of the Class 2-C claim, then that agreement might supersede the present Plan treatment of Class 2-C.

**Westamerica Bank**:

**Class 2-D** consists of the allowed claim presently held by **Westamerica Bank**, to the extent that it allowed as a claim that is secured by accounts, chattel paper and general intangibles of the Debtor while doing business as LONJB. The Plan treats the allowed Class 2-D secured claim by requiring the Debtor to turn over the $5,027.44 that are of the proceeds of Westamerica Bank's collateral and any such further proceeds that the Debtor may acquire

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 15 of 26

prior to the effective date of the Plan. If requested, Westamerica Bank will also receive the chattel paper, accounts and general intangibles of the Debtor that are the collateral security of West America Bank and records and data relating thereto that are not attorney client privileged as described in and defined in that certain "Commercial Security Agreement" dated June 30, 2002. To the extent that Class 2-D's claim is allowed an unsecured claim, its claim is treated as a Class 3 claim.

**Ford Motor Credit:**

Class 2-E consists of the allowed claim presently held by **Ford Motor Credit** to the extent it is allowed as a claim that is secured by a certain **2009 Ford F-450** pickup truck. The allowed Class 2-E claim is treated by the Debtor's August 2, 2013 "surrender" of the **2009 Ford F-450** pickup truck to the holder of the claim. To the extent that Class 2-E's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

**Marin County Tax Collector, 233 Hillside:**

Class 2-F consists of the allowed claim of the **Marin County Tax Collector**, to the extent it is allowed as a claim that is secured by **233 Hillside, Fairfax, California**, Marin County Assessor's Office Parcel Number 002-143-18. Debtor is informed and believes that this claim was paid by Bank of America. The Plan therefore does not provide for payment of the Class 2-G allowed claim. If the claim is not withdrawn by the date of hearing on this disclosure statement, July 23, 2013, the Debtor will file an objection to the allowance of the claim. To the extent that Class 2-F's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim. The Marin County secured tax on 233 Hillside that became due after the filing of Debtor's case have been fully paid and all taxes due for all prior years and the 2012-2013 tax year have been paid.

**Marin County Tax Collector, 29 Anton Way:**

Class 2-G consists of the allowed claim of the **Marin County Tax Collector**, to the extent it is allowed as a claim that is secured by **29 Anton Way, Novato, California**, Marin County Assessor's Office as Parcel Number 143-380-26. Subsequent to the filing of the case the claim was paid, and the claim was withdrawn. The Plan therefore does not distribute any property to the holder of the Class 2-G claim. The Marin County secured tax on 29 Anton Way that became due after the filing of Debtor's case have been fully paid. All Marin County secured taxes for all prior years and the 2012-2013 tax year have been paid.

**Sonoma County Tax Collector, 9908 Main Street:**

Class 2-H consists of the allowed claim of the **Sonoma County Tax Collector** to the extent that it is allowed as a claim secured by **9908 Main Street, Monte Rio, California,** Sonoma County Assessor's Office Parcel Number 095-160-006. The Plan does not pay any money on account of the claim; it requires Debtor to surrender the property securing the claim to the holder of the claim. To the extent Class 2-H's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

**Lake County Tax Collector, 11793 Widgeon Way:**

**Class 2-I** consists of the allowed claim of the **Lake County Tax Collector** to the extent that it is allowed as a claim that is secured by **11793 Widgeon Way, Clearlake Oaks, California**, Lake County Assessor's Office Parcel Number 035-272-090. The Plan does not pay any money on account of the claim; it requires Debtor to surrender the property securing the claim to the holder of the claim. To the extent Class 2-I's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

**Denton County Tax Collector, 9635 Cole Road:**

**Class 2-J** consists of the allowed claim of the **Denton County Tax Collector** to the extent it is allowed as a claim that is secured by **9635 Cole Road, Pilot Point, Texas.** Subsequent to the filing of the case, the holder of the Class 2-C claim paid the Class 2-J claim. The Plan therefore does not provide for payment of the Class 2-J claim. If the claim is not withdrawn by the date of confirmation of the Debtor's Plan, Debtor will file an objection to the allowance of the claim within 30 days after confirmation of the Plan**.** To the extent Class 2-J's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim. However, since the Denton County Tax Collector is fully paid to date for all real estate taxes that were due at the time of filing and all real estate taxes that have come due during the administration of the estate, it seems likely that upon objection this claim will be withdrawn.

**Denton County Tax Collector, 9681 Cole Road:**

**Class 2-J-1** consists of the allowed claim of the **Denton County Tax Collector** to the extent it is allowed as a claim that is secured by **9681 Cole Road, Pilot Point, Texas.** Debtor's interest in 9681 Cole Road was that of a lessee and optionee in possession of the property. Debtor disputes that the Debtor's interest was liable for such taxes. Subsequent to the filing of the case, the Debtor surrendered his interest in 9681 Cole Road to the owner-lessor and the Class 2-J-1 claim was paid, presumably, by the owner-lessor. The Plan does not provide for payment of the allowed Class 2-J-1 claim because the claim has been paid. If the claim is not withdrawn by the date of confirmation of the Debtor's Plan, Debtor will file an objection to the allowance of the claim within 30 days after confirmation of the Plan**.** To the extent Class 2-J-1's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim. All taxes that are secured by 9681 Cole Road and have come due during the administration of the estate have also been paid. Debtor believes that it is likely that upon objection this claim will be withdrawn.

**GE Capital Retail Bank, 2008 Exiss horse trailer:**

**Class 2-K** consists of the allowed claim of **GE Capital Retail Bank** to the extent that it is allowed as a claim that is secured a **2008 Exiss horse trailer**. The Plan requires the Debtor to surrender the property securing the claim to the holder of the claim on the effective date of the Plan. To the extent Class 2-K's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 17 of 26

**Redwood Credit Union, 2006 Sundowner horse trailer:**

**Class 2-L** consists of the allowed claim of **Redwood Credit Union** to the extent that it is allowed as a claim that is secured by a **2006 Sundowner horse trailer.** Debtor surrendered the property securing the claim during the summer of 2012 to the holder of the claim. The Plan therefore does not provide for payment of the Class 2-L claim. If the claim is not withdrawn by the date of confirmation of the Debtor's Plan, Debtor will file an objection to the allowance of the claim within 30 days after confirmation of the Plan**.** To the extent Class 2-L's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

**Redwood Credit Union, 2000 Fleetwood Jamboree motor home:**

**Class 2-M** consists of the claim of **Redwood Credit Union** to the extent the claim is allowed as a claim that is secured by a **2000 Fleetwood Jamboree motor home.** As of July, 2012, the claim had been paid in full by the adequate protection payments Debtor made to the holder of the claim since the filing of the case. The Plan therefore does not make any distribution to the holder of the Class 2-M claim. If the claim is not withdrawn by the date of confirmation of the Debtor's Plan, Debtor will file an objection to the allowance of the claim within 30 days of confirmation of the Plan**.**

**Fred A. Rico Hurvich, first priority deed of trust for Debtor's remainder interest in 1868 Virginia Avenue:**

**Class 2-N** consists of the allowed claim of **Fred A. Rico Hurvich**, to the extent that it is allowed as a claim that is secured by the Debtor's remainder interest in **1868 Virginia Avenue, Novato, California.** Hurvich's claim is secured by a first priority deed of trust for Debtor's remainder interest in **1868 Virginia Avenue, Novato, California.** The Plan provides that Debtor will surrender the property securing such claim to the holder of the claim. To the extent Class 2-N's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim

**Michael Abrams, second priority deed of trust for Debtor's remainder interest in 1868 Virginia Avenue:**

**Class 2-O** consists of the allowed claim of **Michael Abrams**, to the extent that it is allowed as a claim that is secured by the Debtor's remainder interest **1868 Virginia Avenue, Novato, California**. **Abrams'** claim is secured by a second priority deed of trust for Debtor's remainder interest in **1868 Virginia Avenue, Novato, California.** The Plan provides that Debtor will surrender the property securing such claim to the holder of the claim. To the extent Class 2-O's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

**Theodore Phillips, third priority deed of trust for Debtor's remainder interest in 1868 Virginia Avenue (see also Class 2-R, below):**

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 18 of 26

Class 2-P consists of the allowed claim of **Theodore Phillips,** to the extent that it is allowed as a claim that is secured by the Debtor's interest in **1868 Virginia Ave, Novato, California. Phillips'** claim is secured by a third priority deed of trust for Debtor's remainder interest in **1868 Virginia Avenue, Novato, California**.  The Plan provides that Debtor will surrender the property securing such claim to the holder of the claim. To the extent Class 2-P's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

**Mary H. Hubert, 9908 Main Street (disputed claim)**:

Class 2-Q consists of the allowed claim of **Mary H. Hubert,** to the extent it is allowed as a claim that is secured by **9908 Main Street, Monte Rio, California.** Mary H. Hubert does not hold a valid claim. Mary H. Hubert did not file a claim, and her claim was scheduled as a $4,000 unliquidated, non-contingent, disputed claim. Mary H. Hubert therefore does not hold an allowed claim, and she is not entitled to receive any distribution under the Plan. Hubert's first deed of trust lien was recorded in 1973, and satisfied by a prior owner of the property in 1974; no payments have been made on the claim, nor has any payment been demanded since 1974. Debtor will file a proceeding to determine the extent and validity of Hubert's first deed of trust lien within 60 days of the effective date of the Plan.

**Theodore Phillips, 9908 Main Street:**

Class 2-R:  The allowed claim of **Theodore Phillips,** to the extent it is allowed as a claim that is secured by **9908 Main Street, Monte Rio, California.**  The Plan provides that Debtor will surrender the property securing such claim to the holder of the claim. To the extent Class 2-R's claim is allowed as an unsecured claim, its claim is treated as a Class 3 claim.

### 3.  Non-priority Unsecured Claims (Class 3).

Non-priority unsecured claims are claims that are not secured by property of the estate and are not entitled to a priority in payment under § 507(a) of the Code, including the portion of claims that are secured by property of the estate that are allowed as unsecured claims as the result of the operation of § 506 of the Code.  The Plan classifies non-priority unsecured claims as Class 3 Claims.

The Plan treats non-priority unsecured claims by (1) the pro rata distribution, after payment of allowed administrative claims, of all of the proceeds collected by enforcement of the Trieber judgment; and (2) the pro rata distribution of $15,000 to be paid in 60 equal monthly installment of $250.00 per month commencing after February 23, 2017.

The Debtor estimates, based on claims filed claims to date, that the $15,000 distribution of $15,000 will result in non-priority unsecured claims receiving payment of 0.4% of the allowed Class 3 claims. If Debtor succeeds in obtaining a recovery on the Trieber Judgment of $50,000 to $150,000, Debtor estimates that after payment of the estimated $35,000 administrative expenses unsecured claims Class 3 claims would receive 0.7% to 5.0% of their allowed claims under the Plan.

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 19 of 26

Creditors with an allowed secured claim can make an election under section 1111(b) at any time before the conclusion of the hearing on the disclosure statement or within such later time as the court may fix, to have their entire claim allowed as a secured claim. Such an election eliminates a creditor's allowed unsecured claim, and would increase distribution to the unsecured class of claims. The holder of the Cole Road first priority deed of trust claim, Class 2-D, has made an election under 1111(b).

**4. Class of Equity Interest Holders: The Debtor's interest in property of the estate.**

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor's property. Where the debtor is an individual, the Debtor is the holder of an "equity interest." The Plan therefore classifies the equity interest of the Debtor in the property of the estate as a "Class 4" interest. Debtor's Liquidation Analysis, Exhibit A, indicates that the Debtor has exempted most of his unencumbered property from the estate.

The Plan treats the Debtor's interest in property of the estate by allowing the Debtor to retain all such property. However, if the class of non-priority unsecured claims (Class 3) does not accept the plan, and if the court determines that the Plan is not fair and equitable because Debtor's Plan provides that the Debtor shall retain property on account of his interest, all interests of the Debtor in property, other than property that the Debtor has exempted from the estate, and other than his earnings from services performed by the Debtor after the commencement of the case, shall not be retained, but shall be sold at auction, subject to overbid.

**C. Means of Implementing the Plan**

Debtor's Plan requires that Debtor continue to own and operate Bloomfield Law Group, Inc. a professional corporation, and Debtor expects to continue to receive his salary from BLG and use his salary to fund payments due under the Plan. Debtor will also continue to collect the accounts of the Debtor created when Debtor did business as business known as "The Law Offices of Neil Jon Bloomfield" in order to fund the payments required to Westamerica Bank. Debtor will also continue to own and operate the 233 Hillside, 29 Anton Way, and 9635 Cole Road properties, and will use the rents to fund the Plan.

The $10,000 retainer paid to the LLS is the initial source of payment for the administrative expense of attorney fees. The Trieber Judgment is a potential source of payment for the administrative expense of attorney fees and Class 3, non-priority unsecured claims.

**D. Risk Factors**

The proposed Plan has the risk that BLG becomes unable to pay Debtor a salary or other distribution. It also has the risk that the rents for Debtor's real properties may decrease or be interrupted due to vacancy or non-payment by tenants. It is also possible that collection of the Trieber Judgment will not result in the receipt of any funds.

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 20 of 26

**E. Executory Contracts and Unexpired Leases**

The Plan, in Article VIII, lists all executory contracts and unexpired leases that the Debtor will assume or reject under the Plan. "Assumption" means that Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. Debtor is not in default on any of his executory contract or lease obligations.

Under the Plan, the Debtor assumes the following executory contracts and unexpired leases effective upon the date of the entry of the order confirming this Plan.

A.    All insurance policies insuring 233 Hillside;

B.    All insurance policies insuring 29 Anton Way;

C.    All insurance policies insuring 9635 Cole Road;

D.    Lease agreement between the Debtor, dba The Law Offices of Neil J. Bloomfield, and Bloomfield Law Group, Inc. for office space in 901 E Street, Suite 100, San Rafael, CA;

E.    Contract with Pitney Bowes for postage meter and scale;

F.    Contract with AT&T Mobility for cellular phone service;

G.    Contract with Iron Mountain for records storage and retrieval service;

H.    Contract with PACER Service Center for electronic document retrieval service;

I.    Contingent fee agreement with Bloomfield Law Group, Inc. for collection of accounts owed to Debtor for legal services provided by Debtor, dba The Law Offices of Neil J. Bloomfield;

J.    Contingent fee agreement between Debtor and Bloomfield Law Group for collection of the Debtor's interest in the Trieber Judgment;

K.    Lease agreement with Zuri Van Zant for 29 Anton Way, Novato, California.

L.    All Insurance Policies in effect insuring the Estate's vehicles and trailers

All of the contracts and leases listed above are not in breach, and Debtor is not delinquent in any payment obligations under the agreement or lease.

Under the Plan, the following unexpired lease is rejected.

A.    Lease agreement with Fred A. Rico Hurvich for 233 Hillside, Fairfax, CA.

If you object to the assumption or rejection your unexpired lease or executory contract, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

Case: 12-40625    Doc# 309    Filed: 09/03/13    Entered: 09/03/13 15:03:08    Page 21 of 26

**Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract**. Claims arising from the rejection of a lease or contract shall be filed within 60 days after the date of confirmation of the Plan. Any claim arising from the rejection of a contract or lease will be barred if the proof of such claim is not timely filed, unless the Court orders otherwise.

### F. Tax Consequences of Plan.

**1. Tax Consequences to the Debtor**. The filing of an individual chapter 11 petition creates a bankruptcy estate that for federal income tax purposes is treated as a separate taxable entity. The bankruptcy estate must pay tax on all of its income. The bankruptcy estate, rather than the Debtor, must include in its gross income both Debtor's gross earnings from his or her performance of services after commencement of the case, and the gross income from property acquired by Debtor after the commencement of the case. The bankruptcy estate also succeeds to the tax attributes of the Debtor, including net operating loss carryovers. Debtor filed for and obtained an extension for the filing of the return for the estate that was due April 15, 2013. Debtor believes that due to his large net operating loss carryovers the estate will have no tax liability.

**2. Tax Consequences to Creditors.** Confirmation of the Plan should not result in any tax consequences to any class of creditors except those Creditors who receive a distribution after they have charged off a claim for tax purposes. As to those Creditors, there may be a recognizable gain when the claim is paid. Creditors should consult with their own tax advisors to determine that tax consequences resulting from confirmation of the Plan.

### IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. In general, a plan may be confirmed if (i) it is accepted by each impaired class, or (ii) it is accepted by at least one impaired class (exclusive of a class of insiders) and the Court determines that it is "fair and equitable" (as defined by 11 U.S.C. § 1129(b)) to all dissenting classes of creditors. A class of creditors accepts the plan if it is accepted by a majority in number and two-thirds in dollar amount of creditors who cast ballots. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

The determination of whether a plan is "fair and equitable" is complex. You should consult your attorney if you are part of dissenting class of creditors and Debtor requests that the court nevertheless confirm the Plan because it is "fair and equitable."

### A. Who May Vote or Object

Any creditor or party in interest may object to the confirmation of the Plan if the party believes that the Plan does not meet the requirements for confirmation. However, only a creditor or equity interest holder with an "allowed claim" or an "allowed equity interest" has the right to vote on the Plan.

Case: 12-40625    Doc# 309    Filed: 09/03/13    Entered: 09/03/13 15:03:08    Page 22 of 26

### 1. What Is an Allowed Claim or an Allowed Equity Interest?

Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

The deadline for filing a proof of claim in this case was May 29, 2012.

### 2. What Is an Impaired Claim or Impaired Equity Interest?

Section 1124 of the Code states that a class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. The Plan provides that certain classes of allowed secured claims will receive the property securing their claims on the effective date of the Plan. The Plan alters such claimholders contractual, legal or equitable right to be paid in cash. Debtor therefore believes that all classes of claims that are treated by the Plan are impaired and are therefore entitled to accept or reject the Plan.

### 3. Who is Not Entitled to Vote

The holders of the following types of claims and equity interests are not entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

– holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

– holders of claims or equity interests in unimpaired classes;

– holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

– holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

– administrative expenses.

HOWEVER, EVEN IF YOU ARE NOT ENTITLED TO VOTE ON THE PLAN, YOU HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN AND TO THE ADEQUACY OF THE DISCLOSURE STATEMENT.

### 4. Who Can Vote in More Than One Class

A creditor whose claim has been "bifurcated," i.e., allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each class claim that the creditor holds.

### B. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis, attached to this Disclosure Statement as Exhibit A, indicates that the creditors and interest holders will receive at least as much under the Plan as they would receive in a chapter 7 liquidation.

The Plan provides that any proceeds of the Trieber Judgment that Debtor receives after payment of attorney's fees and costs of collection, and after payment of administrative expenses, shall be paid to Class 3, unsecured creditors. Such treatment ensures that creditors will receive under the Plan at least as much of the Trieber Judgment as they would receive in a Chapter 7 liquidation.

### C. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 1. Ability to Initially Fund Plan

The Plan Proponent believes that Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. The estate had balance of $ 20,113.48 as of June 18, 2013 in its bank accounts.

### 2. Ability to Make Future Plan Payments and Operate without Further Reorganization

The Debtor has provided projected financial information, set forth in Exhibits C, D, E and F, which indicates the Debtor's ability to make future plan payments

Exhibit D projects that Debtor will have an aggregate monthly average cash flow of $4,229 and monthly living expenses of $3,934, and that Debtor will have a projected monthly disposable income of $295. Debtor therefore believes he will be able to make the payments that the Plan requires from his projected monthly disposable income to priority unsecured claimholders, estimated at $255.40 per month, and the subsequent $250 per month to non-priority unsecured claims.

Plan payments to Class 2-A, the claim secured by the 233 Hillside property, increase by $490.37 from $3,068 per month to $3,558 on July 1, 2018, an increase of 16%, and increase again on July 1, 2019 by $295 to $3,853, an increase of 9%. An income and expense projection for 233 Hillside is set forth in Exhibit E. Note 4 of Exhibit E indicates that Marin County single-family home rental prices have been rising significantly in the last several years. Exhibit E therefore projects a reasonable and conservative 3.0% annual rent increase. Debtor expects that increased rental rates in years 4, 5, and 6 of the Plan will continue through 2019 and will be sufficient to cover the Plan's increased payments to Class 2-A.

The Plan requires payments of $2,600 per month to Class 2-C, the holder of the claim secured by the Cole Road property, during the first 5 years of the Plan.  The Plan payments to Class 2-C increase after five years to $ 4,800 per month.  Rental income from 9635 Cole Road has been sporadic since the filing of the case because the Debtor has had problem tenants. Ideally, the entire Cole Road property would be rented to a single tenant. However, Debtor has found it difficult to obtain a single tenant for the entire property. The most recent, defaulting tenant, who was evicted on June 13, 2013, had agreed to pay $3,750 a month for the main house, the rear barn, and the non-exclusive use of the equine facilities. The Debtor expects to obtain a replacement tenant who will agree to pay $3,750 a month or more for the main house and rear barn. Needed repairs have been completed and the house and rear barn are ready to rent.

Debtor has rented the three small apartments on the Cole Road property for a total of $1,200 per month commencing August 10, 2013. However, a mobile home and the front barn on the property do not presently produce any rental income because they need extensive repairs in order to make them rentable.

The Debtor projects Cole Road rental income of approximately $4,950 in the immediate future, consisting of rent for the main house and rear barn ($3,750) and the combined rents for the three small apartments ($1,200).  The Debtor projects immediate expenses of taxes, insurance, maintenance and debt service of $4,342 a month (See Exhibit D).

Debtor believes that over the first five years of the Plan, the cash flow of the property will allow Debtor to establish a reserve sufficient to improve the front barn and the mobile home.  Debtor believes that by the time the increase monthly installments on the Class 2-C claim become due under the Plan the rents from the improved front barn and mobile home will be sufficient to provide the additional $2,200 required to pay the increase.

Debtor's continued possession of the property is in jeopardy because the Class 2-C claimholder is entitled to proceed with foreclosure if it does not receive "adequate protection" payments of $3,250 per month. Adequate protection payments have not been paid for a number of months. Debtor expects to negotiate a revised adequate protection arrangement, or to have the plan treatment supersede the prior adequate protection agreement.

The Plan also provides for payment of the balance of the Class 2-C claim on the 121st month after confirmation.  Debtor will sell or refinance the property to pay debt secured by the property in the 121st month (ten years from confirmation).

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 25 of 26

# V.  EFFECT OF CONFIRMATION OF PLAN

## A.  Discharge.

Confirmation of the Plan does not discharge any debt provided for in the Plan until the Court grants a discharge on completion of all payments under the Plan, or as otherwise provided in § 1141(d)(5) of the Code. Debtor will not be discharged from any debt excepted from discharge under § 523 of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## B.  Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan if such modification is material to non-consenting classes. Where the Debtor is an individual, and at any time after confirmation of the Plan but before the completion of payments under the Plan, the Code allows the Debtor, the United States Trustee, or the holder of an allowed unsecured claim, to request that the Plan be modified to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

## C.  Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.


/s/   Neil J. Bloomfield
NEIL J. BLOOMFIELD, Debtor
and Plan Proponent

/s/   Lawrence L. Szabo
LAWRENCE L, SZABO,
Attorney for Debtor and Plan Proponent

Case: 12-40625   Doc# 309   Filed: 09/03/13   Entered: 09/03/13 15:03:08   Page 26 of 26